May it please the court, my name is Tim Garrigan. I'm here representing the plaintiff class in this case. This appeal is about the interpretation and termination of portions of a decree and corrective action order concerning the Children's Medical Program, excuse me, the Children's Medicaid Program in Texas. It involves the health care of over three and a half million of Texas poorest and most vulnerable children, which depends on the court enforcement of a consent decree and corrective action order in this case. Texas obligated itself to comply with this Medicaid program in exchange for federal funding, but they are not providing the plaintiff class members with the medical care that's required by the federal statute. The cornerstone of the program is a series of annual and semi-annual checkups and follow-up care. Most of the class members are only enrolled in the program for a few months, so it's very important that they get these checkups on a timely basis, or they will not get the benefit of the whole program. This case was filed in 1993. The defendants have not contested that most of the duration of this case is a result of their strategy of noncompliance and appeals. In order to settle many of the claims, the parties agreed to a decree in 1996 that was then supplemented with a corrective action order in 2007 to settle ongoing issues of noncompliance. There's no doubt in this case the interpretation of these documents is governed by the rules and principles of contract interpretation. The relationship between the parties is governed by these documents, and the relationship between the two documents is also critical. It was hoped by complying with a corrective action order, the defendants would also comply with the decree, and only once the defendants complied with the corresponding parts of the decree and the corrective action order could those provisions be terminated on a piecemeal basis. Now, the structure of these documents is also important. Not to interrupt you, but it would help me if you could point as specifically as possible, because the district court's decision is 46 pages long. Yes. Where do you perceive error? Is it legal or factual? It's primarily legal. There are factual problems with this case. The factual problems are evident in the briefs, and I mention those because I believe they will support the notion that a mistake has been made. The difficulty, there isn't much, it's not your fault or the opposing counsel, there's just not much law, so overwhelmingly I went back to our court's March decision. Judge Wiener, authors for the panel, it's unanimous panel. And I guess, is there any reason I wouldn't start there to get the legal framework? Yes. Well, I would tread carefully there. Of course, you're obligated by that case, or excuse me, you're bound by that case. But it is subject to a petition for cert. The Supreme Court ordered a response that was filed Monday this week. The big issue is there. It seems at the outset, standard of review, the court said, Justice's conclusions don't have any sort of ongoing impact first. And then also sort of the court went on at some length to say this order that we're interpreting isn't one about impact and effectiveness results specifically. That was the, that is one of the issues in that case. But it seems somewhat analogous. I mean, there, right, the pharmacist, the 72 hours, a pretty discreet identifiable result, and yet our court said substantial compliance exists. The district court looked at it. In that case, the court said effectiveness was not an issue. Right. It was not a measure or something that needed to be considered. Let me jump to this case for you. So the issue that I, you know, I think I'm right, and it's difficult for me on both sides, that the order doesn't say what a shortage is. And to me, it doesn't say how you determine a shortage. And yet there's surrounding language that says, well, you would only want to know if there's a shortage as to people who aren't just enrolled but are available. And Judge Schell seems to have said, I'm going to do my best. And they're available if they're within a distance and there's no evidence of any delay by these patients. And he says, I don't see that. The defendants have given me enough to think there's been a lot of progress. Where's the error? Is it legal or factual in that? The legal error is the fact, and what's at the basis of this case and other issues as well, is that the plaintiffs are not getting the benefit of the bargain that they've struck. Part of the court's opinion, the other panel's opinion, analogized essentially the activities required by the corrective action order to be a road map that had to be followed. Use that language. Okay. In this case, excuse me, well, in this appeal, the issue, well, it's different because the plaintiffs negotiated. Well, the road map says you've got to come up with a plan if there's a shortage. So I think that I would see reversible error because they're not saying they came up with a plan, but their position is Judge Schell's right. There is no shortage. There may be a shortage for all Texans as to some types, but where's any evidence that there's a shortage for the class plaintiffs? Well, what we negotiated for and what's reflected in particularly the corrective action order is that the shortages are supposed to be based on the assessments that are prescribed in that corrective action order. I agree with that, but then the assessments don't tell you how. No, the assessments don't have a specific measure for what a shortage is, but the language does describe that an adequate supply is only one that can provide access to the whole class. But then if he makes a factual finding that this class hasn't met with delays, why isn't that a – There's no evidence of delays. There's no evidence regarding delays at all. There's no evidence of delays, but okay, so that would support that there may not be a shortage unless I'm really missing something. No, I think you are, or maybe you are. I'm sorry if I haven't made it clear. The corrective action order requires the use of the prescribed assessments to determine what a shortage is. The agreement included a definition of what an available provider is. That's not determined by distance standards. I agree. That was we negotiated for and had an agreement that the provider supply issue in this case would be evaluated based on those assessments that include those critical, detailed, negotiated assessments. And instead, Judge Schell, when it became clear that the assessments – and there's no doubt, the assessments showed shortages. Okay, well that's a really important statement of yours. There's no doubt the assessments showed shortage. What's the record site for that? The record for that is that when the corrective action order was entered in 2007, there was a very broad recognition that provider shortages were dramatic, undeniable, widespread. And so the shortages were very clear there, and they've only gotten worse. I know you say that, but that has to be based on the assessments. Where in the record do the assessment data show that there's a shortage for the class plaintiffs? It shows that those – the shortages that were recognized when the corrective action order was entered have gotten worse. The class has grown at a much greater pace than the supply of providers. So those shortages that were there in 2007 have only gotten worse. Another – I believe the language in the decree in the corrective action order suggests that an adequate supply of providers is whatever is necessary to provide access to the plaintiff class. Access includes these checkups that are supposed to occur and follow-up care. Well, counsel, one of the things the government argues in its brief, since there is no real standard set out in the agreement about how to determine what a shortage is, is to compare the relative access of people within the class to people outside of the class who are in the same locales in Texas, and the evidence, at least according to the state, is that it shows there are just large parts of underserved – large parts of Texas are underserved in all the variety of ways that this class action is trying to develop access for Medicare patients. And so they are – I mean, is there evidence in here that would show your class members are worse off in access to the various categories of medical care than our everyday citizens who are not taking – not everyday, but those who are outside of Medicare? I mean, is Texas supposed to correct the medical supply problem in the state of Texas or just make sure that this class members are treated or have equivalent access of other citizens? In this case, in the decree, in the corrective action order – I mean, you may be trying to answer that. Let me make sure – can you answer that question? Is there an obligation on the state to do more for the class members than is available to other people in the same locale who are not class members? Is that how you interpret it? Well, the state has agreed to do more. The state has agreed that it would assure adequate access. Adequate access can only mean that they're getting the checkups and the follow-up care. We know from the records, from the assessment and from other reports, less than half of the class members are getting the required checkups. It's more like – Wait, just so we know that, do you have a record site for that? I do. There's a form called a 416, I believe. I can provide that for you in a – Go ahead. Keep answering, Judge Southwick. Okay. There's no doubt that they are not meeting that definition of an adequate supply. The supply is what's necessary. It's whatever is necessary to provide adequate access. They are not providing adequate access. Since the original decree, they have maybe not sufficient funds, but they've added funds. They've increased the reimbursement rates. They have done a variety of things that Judge Schell was impressed by, at least, to make Medicare more attractive to medical providers and get more of them involved in providing care. I think that's where Judge Schell measured whether there had been substantial compliance or not. What I'm hearing from you is that the right way to interpret this is not whether Medicare patients are receiving equivalent treatment to those who are outside of Medicare, but they must be adequate by a higher objective standard of what any of us would want, in all fairness, not a fair statement, any of us would want when we're looking for medical care. That's going to be an extraordinary interpretation of this, I think. No, that's not what we're urging. We just want the defendants to comply with what they agreed to. Well, that's what you're saying they agreed to, though. They agreed that they would provide adequate access, and that was for the whole class. That is what they agreed to. The language supports that. What the issue is here, I believe, is whether the court has provided us with what we negotiated for. In settling the claims in this case, the district court rejected their notion that the assessments do not show shortages. The district court said that was disingenuous. They agreed to this process, and they made this disingenuous argument. I'm sorry, the district court said it's disingenuous to deny that there are shortages as shown by the assessments? Yes. What's the record set for that? It's in the court's opinion. I can't give you the precise— It's in the opinion? Yes. The word disingenuous is used, or disingenuine is used. The court also recognized that they did not take any actions in response to the assessments. That's what they agreed to do. They agreed to develop plans to address those shortages that are identified by the assessments. Yes. There's no doubt. Nobody argues that the shortages aren't shown. Okay. That's a really big issue. What I think Judge Schell did was he said, I'm going to go look for a different definition of shortages, and I'm going to choose what the defendants want, which are these time and distance standards that have nothing to do with real access. Well, distance is difficult for me to see that it does, but the delay emphasis that he gives would seem to be a plausible measure, especially if our court said he doesn't have to follow Judge Justice's measures, and this order doesn't tell us any other ones. So he's looking, and he says if no one's got a delay meeting a doctor, that doesn't look like a shortage. There's no evidence that delays are only reasonable. The problem is the court recognized they did not do anything in response to these assessments. The assessments show shortages that are generally not discussed. We negotiated for the provider supply to be evaluated based on the shortages identified in those assessments. Yeah, I'll sit down. We have time for rebuttal. Thank you. I'm sure you'll get to it, but will you flesh out where Judge Schell made the comments that we just heard about? Yes, Judge Southwell, I can start there if you would like. Please. Let me address the comment about disingenuous. You can find that at page 29 of Judge Schell's order, record page 74169, and he's addressing there the issue of compliance under prong 1 of Rule 60B-5 with bullet points 8 through 10 of the corrective action order. And what those say is you have to perform these four assessments. You have to report one statistic about available providers. Paragraph 10 defines the term available. And then if any shortages are found, you have to develop a corrective action plan. And as you noted, Judge Higginson, the CAO does not define the term shortage. I think, Judge Higginson, you stated that the state had not, in fact, developed a corrective action plan. Judge Schell indicated we disagree. I think I want to correct your understanding on that. The assessments did not show any shortage, but nonetheless the state still did develop corrective action plans based on the potential for a shortage. And so it investigated whether certain areas of the states might have had actual shortages and concluded that there were not. But it went out. It recruited additional providers. To the extent there's a shortage, it's identical to any other Texan in that geography. Correct. The federal law requirement here for adequacy of provider care is Section 30A of the Medicaid Act. It's subsection A30, big A, 42 U.S.C., section 1396A. It was addressed by the Supreme Court last year in the Armstrong decision. And it requires that the state's funding for Medicaid, the Medicaid provider rates, be adequate to do a number of things, among which is ensure that Medicaid recipients have access to providers that is equal to that enjoyed by the population in the geographic area. Well, one of the discussions I had with your friend on the other side is whether, in fact, this consent decree requires more. Right. That's the argument. A shortage is not defined in the way that you just said in this decree. So what about that? Well, I've got at least three points that kind of hinge on that observation that he made. So we disagree with that. But let me first note here that the district court ruled under both the first and the third prong of Rule 60b-5. The first prong assesses satisfaction of the court's commands. But the third prong is a flexible, equitable test that, as the Supreme Court explained in its Horn decision in 2009, turns fundamentally on whether the consent decree is still remedying a violation of federal law or a condition that flows from such a violation.  And it said that to the extent a consent decree goes beyond that, it is improper. So even if it were true, which we disagree with here, that assessment provider adequacy is to be gauged by some higher standard under the decree, that doesn't bear at all on the prong three ruling, which is an independent and adequate basis to affirm. Let me point out that your observation about compliance with the decree also goes to the standard of appellate review. And this court's March 2015 decision in this case explained that the standard of review is abuse of discretion. There it was proceeding under prong one, and so it interpreted the decree de novo. But it reviewed the district court's finding of substantial compliance for clear error. You can see this in the substantial compliance part of the court's opinion. And at footnote 41 of the court's opinion last year, it cites this court's case in Terrell, which explains that substantial compliance is a, quote, pure question of fact. Well, yeah, I was looking closely at that to see if there was burden shifting here because the court did say absent indicia of unreliability, we don't find there's clear error in his conclusion. Right. So applying that here, I guess my difficulty is clearly the shortage is based on the assessment data. If assessment showed shortage. So how did Judge Schell, what data from the assessments rather than the distance delay formulation, what data from the assessments did he use to conclude there was no shortage? Well, he said that the assessment data, the figures reported in the assessments don't show a shortage because there's no specific ratio established anywhere in the CAO. But let me take a step back here and explain when the term shortage is not defined in the CAO, but at the beginning of the CAO, it talks about paragraph 197 of the consent decree, which explains there's an obligation to assure an adequate supply of provider so that recipients have reasonable access to providers within, I think the phrase is reasonable wait times to get an appointment, wait times at the office, and travel distance standards. So the CAO itself talks about the very common sense functional measure of adequacy of provider supply, which is can people get to see their doctors within a reasonable time? When you look at the availability, it seems to really key on, it doesn't help any of these class members if they're enrolled but not actually seeing people. So what the assessments, I may be wrong in simplifying it, but they're drilling down to say, okay, doctor, are you actually in the last six months seeing a Medicaid patient? If you are, then you're available, and let's hope you're within 31 miles. But I didn't see that Judge Schell, you know, if you're within 30 miles but you're in Houston, that's not going to help many. If you're within 30 miles and you're enrolled but you're not seeing people, it's not going to help anybody. So there's a lot to that question. First of all, you need to add one more qualification to what you said. The definition of available is not just are you seeing any Medicaid patient but have you billed for a new patient in the past six months. CIO was a settlement. We have not agreed that there was any shortage in 2007. They wanted this assessment. They asked for this statistic. There is a world in which results that might have come back in a factually different world might have shown a shortage. For example, if you came back and it said there's 3 million Medicaid patients and there's two primary care providers statewide or two per city, that would be very strong evidence of a shortage. And there is some language below in which we were trying to, the state was trying to explain why it had this snafu, I would say violation, of the precise terms of whether you assess 6 and 12 months, and we were trying to explain that. And we at times used language like the assessments are incapable of showing a shortage. That's what Judge Schell criticized as disingenuous. I think fairly read, though, the point we were making, and it got caught up in the language, was that the figures that we saw here didn't show a shortage. Perhaps there would have been some results of the assessments that could in and of themselves show a shortage, but there's no ratio established between Planned Parenthood's preferred definition of available and Medicaid class size that would be defined as showing a shortage. And because there's no definition in the CIO of that term, whether the state has substantially complied with its obligation ultimately just turns on applying the fact, applying the interpretation of the decree to the facts, which is a factual question that's reviewed for clear error. It's pretty difficult to think that the district court clearly erred in saying that there was no shortage that required something more than what we did when it looked at all of the evidence and found that there was no evidence of even a single Medicaid recipient that was unable to get access to care. Now, plaintiffs today talked about this form CMS-416. I'll tell you where that's found. It's not in the record, but they cite it in their brief at page 36, footnote 118. And it's a report that shows not access to care but utilization of care, and it looks at a certain measure of how many Medicaid recipients utilize checkups with their primary care provider and said that 50.1 percent of them do. That doesn't mean that 50 percent have inadequate access to care. There are numerous reasons why Medicaid recipients might not utilize care even though they have the access to it. If you look at the declaration of Dr. William Glom, he talks about no-shows being a big problem for doctors who are trying to treat Medicaid. The assessment data that eventually was corrected in the six-month frame does not show, as to any provider type, that the doctors who are actually seeing new patients don't exist in sufficient supply. That's your position based on this immensity of a record. Well, yes, but with the clarification that the definition of available in paragraph 10 does not actually, in fact, capture the doctors who are seeing new patients but who have billed for a new claim in the past six months. Because just to give you an example, let's imagine that there is a population where there's 300 Medicaid recipients who might in a year have used some specialist care and there's 30 doctors, enrolled providers, who have billed for that care. And if over the course of a couple of years that population size increases to 600 and the provider size increases from 30 to 45, you're having a 100% increase in the Medicaid population and a 50% increase in the providers. But it may well be the case that those providers are perfectly able to serve the needs of the entire additional percentage because even though there's only 15 more who have billed for at least one new class member, they may be taking on two new class members each, and then you've got adequate care. That's why you cannot place in distressing adequacy both under paragraphs 8 through 10 but also paragraph 5 in the consent decree. You just, given the numbers we have, you can't place sufficient weight on this one measure of availability absent some extreme results, which, in fact, at the time, before 2007, these studies had not been done. And there was a suggestion that in some parts of the states there were just no providers in an area where there were, for Medicaid patients, where there were providers treating the general population. This report would have provided some data that would have allowed us to find that out, but it didn't show that. It showed a ratio of plaintiff's preferred measure, plaintiff's preferred head count measure to enrolled patients that in and of itself is not an indication of a shortage. And if you have any doubt about that, you should do what the district court did, which is look to functional measures of shortages and adequacy. And again, we put on evidence here that there is not a single Medicaid patient who needed access to care and was denied it. And plaintiffs might say, well, how are we supposed to prove a negative? Well, a good place to start would have been our records. They subpoenaed and got our records of complaints that were made to our complaint hotline. And they put it on, and we rebutted that in this chart that we talked about. It's at page 64, page 85016, and it showed that in every single case the Medicaid recipient got access to care. But even the number of complaints that we received was .002% of the Medicaid population in the state. We put on evidence from the 19 MCOs explaining that they meet federal and state requirements for ensuring access to care. And all of this could reasonably inform the interpretation of shortage in paragraphs 8 through 10. So that's our satisfaction argument onto that, onto the prong one. But again, I want to come back to the point that the district court made a prong three ruling. Even if, and the plaintiffs here talk about, well, that doesn't give us the benefit of our bargain to dissolve paragraphs of an injunctive decree that haven't been satisfied. But all that is doing is disagreeing that prong three is an independent basis for dissolving an injunctive decree. And the Supreme Court held in Horn and held in Rufo that it is. And, in fact, in Rufo the Supreme Court addressed and rejected the specific benefit of the bargain argument that you hear plaintiffs making today, saying that . . . Insofar as you're talking about whether it's not been satisfied, your focus is upon the agreement itself. Now, that's prong one. And I hear you talking more about the third provision of the rule itself, which is no longer equitable. Is that correct? Correct. When the district court ruled on, we're making arguments under both the first prong and . . . I know they're making those arguments, but I don't hear you really interpret it. I see there's a real difference here in, you said, the benefit of the bargain. They get the benefit of the bargain under Rule 1. The question is whether that bargain has been satisfied, right? That's the prong one. Now, if you want to move away from that bargain disjunctively, then you move to whether it is inequitable. Correct? Correct. Now, while your metrics here may reach a different result, how does that equate to inequitable? I mean, inequitable has to have some detached measure off there. As a beholder, we don't like the deal anymore. It doesn't seem to work. Well, the defining case on what is inequitable under prong three is . . . I understand that, but tell me here, what I'm trying to understand with you is your argument. I understand your argument about the metrics. You change those, and you can get different results, but why is that inequitable? So the lead points that we have on . . . I just want to bring back to the actual legal hoops that you've got to come through here. Sure. Let me focus on prong three. I'll explain the standard, and then I'll explain our lead points on it. Yeah. So under prong three, the standard is whether prospective enforcement is no longer equitable. And in Horn v. Flores, the Supreme Court explained that what that means is that federal court decrees, I'm quoting here, exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or flow from such a violation. And we showed here that the federal law requirement regarding provider supply is stated in Section 30A, and we showed that state standards that ensure equity and access between the general population and Medicaid recipients. We put on ample evidence . . . For the purpose of the agreement, you just want to apply state law. Pardon me? You settled a case, you've got an agreement, and you read this to say that, well, that's an agreement, but now the question is, we go back and we say that state law says this, and we can argue that. You've moved completely away from the agreement. Well, to the extent you're saying that prong three allows dissolution of an unsatisfied injunctive order, that's absolutely correct. That's endorsed by the Supreme Court in Horn v. Flores. And, in fact, in Horn and in the Supreme Court's Frueh case, they said that the court should strive to return control of state programs to state officers as soon as possible. And they noted some of the structural problems with consent decrees and institutional reform litigation. The court's been grappling with the difficulties of the structural relief because, over time, they become inequitable and they don't work. They're not really achieving the original goals, and you're not stuck. There's a way to escape those as we go forward, and they're reviewable. I'm trying to get down to the specifics of this case in terms of the choice between metrics here as to whether or not the district court says they no longer work, but that's only if you adopt a particular metric that he chooses to adopt. No, I don't think that's true. I don't think that's true, Judge Higginbotham, because when you look— True enough, but I think that's a pivotal issue, though. Well, when you look at page 20 of the district court's order, he says there is no evidence that any Medicaid recipient has been unable— At page 20, when he—the district court explains there is no evidence that any Medicaid recipient is actually unable to get to see a doctor that they need. And then he goes on to explain in Part 2B, where he's applying Prong 3, that the federal agency with oversight over this, which is CMS, the Center for Medicaid and Medicare Services, reviews the state plans, reviews our amendments. They reviewed the two 1% reductions that you hear plaintiffs complaining about and approved them. Factually, what has been the change in the market? Right. Well, since the consent decrees were entered, the state has transitioned— Yes, the change since the consent decree forward. That's right. The state has transitioned from a primarily fee-for-service model, in which Medicaid recipients were essentially responsible for finding their own providers, to the managed care model that predominates statewide today. And that is a significant change in circumstances. In fact, CMS itself reviews our contract. By regulation, we have to get CMS review of our contracts with the MCOs. Well, I understand that. But that can travel under your—under this basic notion that it's no—that it's being essentially that— not that it's been released or discharged, but upon the fact that it is no longer equitable. In other words, you—essentially you are not achieving the original goals because of change. But that change has got to be external to the parties' ideas about it. And you point to the market, and that's one factor. And is there any other factor? Is that it? What you—I'm not suggesting the insufficiency of it, but I don't want to understand precisely what you're saying. Well, that's— There's been a change in this market, a change in the way and the method in which medical services are being delivered. And the—and you must accommodate and deal with that reality. Well, there was the shift in the MCOs. There was the 25 percent and 50 percent increase in 2007 in reimbursement fees that was done consistent with the CAO here. And there's also the fact that TDI regulations apply to the MCOs. So that plays with the transition to MCO predominance across the state. But I think the Court should—you should take a look— Well, that does translate to the actual provision of services to the people on the ground, what's available to the people on the ground. Right, because the MCOs are required to meet specified distance and wait time standards. The plaintiff said today there's no clarity about what those wait times are. But in our briefing below, we went through and explained under our contracts with the MCOs, there are—there's specified wait time standards for different types of service. If it's a—to see, for example, a specialist for primary specialist care, it's 14 days, 24 hours for certain urgent care. These are all under the MCO contracts. My last point, since we're running out of time, is I'd encourage the Court to look at the Supreme Court's decision last year in Armstrong, where it said there is no privately enforceable right of action to enforce Section 30A of the Medicaid Act, which is the provider supply provision, because it's so—I think it called it judicially unadministrable and relied on CMS's comparative expertise in this subject matter. And that expertise, which the Supreme Court also noted in its 2012 Douglas decision, is precisely the sort of federal agency expertise that matters under Prong 3 when courts are looking at whether there is a durable remedy or what the district court here called a safeguard to ensure that there is no future violation of federal law. So while Prong 3 is sufficient to affirm the judgment below, Prong 1 is also sufficient. And this Court reviews the district court's finding of substantial compliance for clear error. Plaintiffs have not showed any error, much less anything arising to the level of clear error, so we respectfully ask the Court to affirm. All right, Counsel. Okay, first of all, I want to mention that these arguments regarding whether there's statutory compliance and whether that should control this case, those arguments were made and rejected years ago by this Court, among others, and the Supreme Court. The fact is the agreements that they made embodied in the decree and the corrective action order arose out of their agreement about how they were going to comply with that statute. It was a legitimate decree. The Supreme Court recognized that. It was within the boundaries. For them to now come back and try to argue statutory compliance should be the measure they're just flat wrong. Do you have any response to the cases that he's been talking about, Armstrong and I don't know if it's Horn was one of them, where the Supreme Court seems to have given some life to perhaps an issue that didn't seem all that alive a few years ago? I would point out the CMS approval of the way they run the program is not this robust, rigorous oversight they're talking about. The fact is CMS was approving of the way they ran things in 1993 when this was filed, in 1997 when they entered into the decree, in 2007 when they entered into the corrective action order. So CMS is, I don't think, applicable to this case. The second thing is . . . Well, your prong three answer isn't so much, hey, we get the benefit of the bargain no matter what, even if it looks inequitable. Your answer is the district court's prong three assessment tied only to its prong one substantial compliance argument, and therefore that's what's before us. No. I believe they're trying to tie it to prong one and prong three, the equitable clause. And I'm sorry, I'm answering a prior question, right? Keep answering the prior question. No, I think it's all together. Horn said that specific compliance is not necessary as long as they have satisfied the purposes of the decree. Okay? They have not demonstrated that they've satisfied the purposes of the decree here. It's not like they've come up with some other solution. And these distance standards they're talking about, the distance standards, they're of limited utility. Their purpose is only to identify those relatively few. And by relatively few in the context of this case, we're talking about tens of thousands of children who are so isolated they don't have access to care. I wouldn't spend your precious minutes on distance, but what about you had time to get a record site for a finding of shortage. Do you have a record site as to a shortage shown by these assessments? It's, I would refer you to our brief. It's, there's not a finding of a shortage, but the shortages, we've demonstrated the shortages that are shown by the assessments. We agreed. Record site for the assessment conclusion there is a shortage by provider type. It may be in the briefs. It's in our briefs. It's the only discussion on what the results of the assessments were, and they are quite dramatic. Another thing we negotiated for was that the assessments would be based on information about actual transactions with providers, not by information produced by the HMOs and their contractors. The distance standards they're talking about are all based on their contractor information, and it's, you know, in violation of basically what we agreed with or what we agreed to. Also, the time or the distance standards, they're using the concept of enrollment, and we know that 70% of the providers who are enrolled are not available under the agreed definition of available. Their distance standards are really quite meaningless here. They do not begin to address whether or not the provider supply is able to meet the requirement of providing all of the checkups to class members. They also rely on contractual provisions requiring their contractors to meet the decree requirements. Now, nobody's ever shown that any of those contractual obligations were ever enforced, and, in fact, that violates paragraph 300 of the decree, where the defendants are supposed to be held responsible for compliance, not their contractors. All right, Counselor. Thank you. Very important case. Appreciate both sides being here to illuminate this for us. We will all take a brief recess.